IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JOSHUA E. ACOSTA,               )
                                        )
         Plaintiff,              )   TC-MD 200140R
                                          )
        v.                        )
                                          )
MULTNOMAH COUNTY ASSESSOR,   )
                                        )
        Defendant.        )   **DECISION**

Plaintiff appeals the real property order of the Multnomah County Board of Property Tax Appeals mailed March 11, 2020, for the 2019-20 tax year. A trial was held by video conference on February 18, 2021. Plaintiff appeared and testified on his own behalf. Barry Dayton and Elliot Scott appeared on behalf of Defendant. Appraisers Greta Klugness (Klugness) and Jan Leendertse (Leendertse) testified as witnesses on behalf of Defendant. Plaintiff's Exhibits 1 through 4, 7, 11, and 12 were received without objection. Plaintiff's Exhibits 5, 6, 8 and 9, were received into evidence over Defendant's hearsay objection. Plaintiff's Exhibit 10 was excluded. Defendant's Exhibits A through F were admitted into evidence without objection. Plaintiff's objection to Exhibit G was sustained.

## I. STATEMENT OF FACTS

The subject property is a single family detached home, built in 1964 and remodeled in 2008, with approximately 3,172 square feet of gross living space, three bedrooms, two and a half baths, and a two-car garage. (Ex 1; Ex 9.) It is located on a view lot in the hills above downtown Portland on a steep slope without a useable yard. (Ex A at 6.) During testimony, both parties described the property as having minimal street parking near the home.

In June 2016, the subject property was purchased by Behgooy for $830,000.[1] (Ex A at 23.) On July 28, 2017, Behgooy signed a warranty deed to Brookfield Relocation Inc. for $1,225,000. (Ex A at 25.) That deed was not recorded with the county until February 15, 2019. *Id*. The relocation company listed the property for sale on the multiple listing service (MLS) for $1,225,000 beginning early September 2017. (Ex 2 at 2; Ex A at 8.) The property was listed for 584 cumulative days. (Ex 2.) During that time, one accepted offer for $938,000, pending on May 11, 2018, fell through due to a sewer easement issue where the real estate agent claimed the sellers did not cooperate with the prospective buyers who needed a home immediately and could not delay. (Ex A at 8.) Overall, the list price was changed eleven times, with a final listing price of $845,000 starting in September of 2018. (Ex. 2.) Plaintiff first noticed the property in 2018 but did not attempt to purchase the property because it was above his price range. (Ex 9 at 1.)

In late 2018, the relocation company scheduled an auction for the property due to a lack of offers. The auction was advertised in the local newspaper and online, with open houses held in November and December 2018, and an online auction held December 3 through 5, 2018. (Exs 3-4.) The advertisements included a pre-auction opportunity where potential buyers could submit their best offer to pull the property off the market before the auction occurred. (Ex 3.) The nominal opening bid was $350,000. (Ex E.) Plaintiff participated in the auction but was not the highest bidder; even so, he contacted the sellers and requested to be kept in mind if a deal was not reached with the winning bidder. (Ex 9 at 1.) The relocation company was unable to finalize the sale with the winning bidder and contacted Plaintiff to negotiate a sales price through email. (Ex 6.) Plaintiff utilized the services of an unrelated real estate agent, Benjamin Acosta,

---

[1] It is unusual for the court to review such an extended sales history of a subject property. However, in this case the prior sales history, the subsequent marketing of the property, and Plaintiff's purchase of the property must be considered to determine whether Plaintiff's purchase represented an arm's-length transaction.

to negotiate the deal. After many back-and-forth discussions, the parties agreed on a sales price of $675,000 plus a buyer's premium of $33,750. (Ex 6 at 2.) The property was sold "as-is, where-is" without contingencies for repairs or inspections. (Ex 4 at 2; Ex 7 at 1.) The executed contract was dated January 18, 2019. (Ex 7 at 2.)

For the 2019-20 property tax year, Defendant assessed the real market value of the subject property at $814,880. (Compl at 2.) Plaintiff filed an appeal with the Board of Property Tax Appeals (BOPTA), which ordered the value be sustained. (*Id.* at 2.) Plaintiff now appeals the BOPTA order and asks this court to find the real market value of the property to be $675,00, exactly equal to the sales price of the subject property, or "a reduction to a more reasonable value." (Ptf's Compl at 1.) Defendant asks this court to sustain its determined value of $814,880. (Def's Ans at 1.)

During trial, Plaintiff testified that his purchase of the subject property represented an arm's-length transaction because it was heavily negotiated between two informed, sophisticated parties and thus best represented the real market value as of the assessment date January 1, 2019. Plaintiff noted that the subject property was in poor condition, requiring multiple repairs, which justified the lower purchase price.

Plaintiff presented an appraisal prepared in connection with his bank loan, which concluded the market value of the subject property was $723,000 as of February 6, 2019. (Ex 8 at 2.) That appraisal identified three main comparable properties, with a fourth as inferior, and a fifth as an active listing. (Ex 8.) Comparable 1 was a four-bedroom, three-bath residence consisting of 2,153 square feet that sold for $820,300 in September 2018. (*Id.* at 2.) The price was adjusted downward by $61,800 for the 618 additional square feet on the main level, and upwards by $17,010 for the 243 fewer square feet for rooms below grade, resulting in an

adjusted sales price of $775,510. (*Id.* at 2.) Comparable 2 was a three-bedroom, three-bath residence that sold for $635,000 in October 2018. (*Id.* at 2.) That price was increased by $12,200 for the 125 additional square feet on the main level and $22,050 for the additional 415 square feet on the rooms below grade, making the adjusted sales price $669,250. (*Id.* at 2.) Comparable 3 was a three-bedroom, three and a half-bath residence which sold for $780,000 in October 2018. (*Id.* at 2.) That sale was decreased by $64,900 for square footage above-grade and increased by $10,080 for square footage below-grade, making the adjusted sales price $737,180. (*Id.* at 2.) Comparable 4 was a three-bedroom, two and a half-bath residence that sold for $715,000 in October 2018. (*Id.* at 7.) That price was increased by $20,000 for lack of view, decreased by $53,100 for above-grade living area, and increased by $10,000 for lack of air conditioning, making the adjusted sales price $691,900. (*Id.* at 7.) Comparable 5 was a listing on the MLS offered by the appraiser as support only. (*Id.* at 2.) The appraiser weighted Comparables 1 through 3 at 30 percent each and Comparable 4 at 10 percent, concluding that the market value for the subject property as of February 6, 2019 was $723,000. (*Id.* at 2.) The appraiser considered the cost approach and found a value of $727,646. (*Id*. at 2.) Plaintiff also submitted a comparative market analysis prepared by Benjamin Acosta, which used three of the same properties in the bank's appraisal and concluded the subject property was worth $706,295 as of the assessment date. (Ex 9 at 2.)

Klugness testified that Plaintiff's Comparable 2 was a bad selection because it had a hazardous driveway entry from a busy street and poor parking. Additionally, the property had thirty steps from the street down to the front door. She testified that Plaintiff's Comparable 3 was "awful," located on a very narrow and steep one-way street, with no parking. She testified that both Comparables 2 and 3 were built around the "turn of the century," 128 and 111 years old

respectively, rendering them unsuitable selections.

Defendants valued the subject property relying only on the comparative sales analysis. (Ex A at 8-10). The cost and income approaches were rejected by Defendant because of the property's age and its use as single-family residence. (*Id*. at 14. ) Five comparables were used to determine the property value. (*Id*. at 10.) The distance of each comparable to the subject property ranged between 150 feet to 0.9 miles. (*Id*. at 27.)

Comparable 1 was a three-bedroom, two and a half-bath home located about one mile from the subject property that sold for $1,084,400 in August 2018. (Ex A at 16.) That price was adjusted downward for location, site utility, and room count on the main level living area in the amount of $141,100. (*Id.* at 16.) The price was adjusted upward for time of sale, below grade room count and gross living area in the amount of $51,720. (*Id*.) The adjusted sale price totaled $999,000. (*Id*.) Comparable 2 was a three-bedroom, three and a half-bath house located a few houses down from the subject property that sold for $1,570,000 in April 2018. (*Id*.) The property had been "remodeled from the studs out." (Ex A at 9.) The sales price was adjusted downward by $250,000 for the remodel, and downward an additional $103,920 due to quality of construction, room count, gross living area, and for an additional fireplace. (*Id*. at 16.) Comparable 3 was a three-bedroom, two and a half-bath home that sold for $1,070,000 in March 2019. (*Id*.) The price was adjusted downward by $95,040 for the time of sale, superior location, room count, gross living area. (*Id*.)

Defendant's Comparables 4 and 5 represent a single property located three lots south of the subject property, which sold prior to and again after the subject property's assessment date. (Ex A at 10.) This property had similar traffic patterns and amenities as the subject property such as views, quality of construction, condition, stilt foundation, and gross living area on the

DECISION TC-MD 200140R

main level.  (*Id.* at 11.)  Leendertse testified that these "paired sales" aid in determining the market conditions taking place.  (*Id*. at 10.)  The first sale was on May 19, 2017, for $899,000 and it sold again on May 20, 2020, for $925,120.  (*Id*.)  There were approximately 32 months between sales with 2.95% market appreciation.  (*Id*.)  Despite common practice among appraisers to limit inclusion of post-assessment sales in the sales comparison approach, Leendertse wrote that a comparable sale after the effective date of the retrospective appraisal assignment was appropriate because the market itself, rather than individual sales, "should be used by the appraiser to determine logical cut off dates regarding sales data."  (*Id*.)  He added that the paired sales were evidence that the market around the assessment date was relatively flat.  (*Id*.)

## II. ANALYSIS

A.  *Scope of Review*

At issue here is the real market value of the subject property as of the assessment date January 1, 2019.  *See* ORS 308.250(1).[2]  ORS 308.205 defines real market value as  "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(2) requires that"[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]"  OAR 150-308-0240(2)(a) provides that there are three approaches to determining real market value: the sales comparison approach, the cost approach, and the income approach, though, "[f]or a particular property, it may be that not all three approaches are applicable."  The income approach is not applicable here because the subject property is residential and not a rental property.  Plaintiff's bank appraisal considered the cost approach while Defendant rejected

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

it because of the age of the property. The court agrees with Defendant that the sales comparison approach is superior because the subject property was not new construction.

In seeking a reduction in the subject property's value on the 2019-20 tax roll from $814,880 to $675,000, Plaintiff bears the burden of proof by preponderance of the evidence. *See* ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing the evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971); *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). When the evidence "is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Once evidence of value has been presented by both parties, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. In order to prevail, Plaintiff's evidence of comparable sales must provide conclusive or persuasive evidence that the court should reduce the property's value.

B.    *Subject Property Purchase Price as Evidence of Real Market Value in the Sales Comparison Approach*

The Oregon Administrative Rules (OAR) provide guidance on what types of sales may be used as evidence of market value in the sales comparison approach. OAR 150-308-0240(2)(c) states that "[a]ll transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.), the transaction may not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition." The OAR also does not address whether these requirements also apply to the sale of the subject property proffered as evidence of market value. The Supreme Court addressed that issue by finding that

the sale price of a subject property may be included with other evidence in the sales comparison approach when the sale of the subject property is a recent, voluntary, and arm's-length transaction. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). When the sale of the subject property meets these criteria, "then the sales price, while certainly not conclusive, can be persuasive of market value." *Id*.

Neither the OAR nor *Kem* define "arm's-length," however, in *Monserud v. Clatsop Cty. Assessor*, TC-MD 100577C, WL 2222187 at 2 (Or Tax M Div, June 6, 2011) this court adopted the definition of "arm's-length" from the Appraisal Institute, which defined it as "involv[ing] '[a] transaction between unrelated parties under no duress.'" (*quoting* Appraisal Institute, *The Appraisal of Real Estate* 305 (13th ed 2008).) As a result, the arm's-length analysis often includes an evaluation of whether the transaction was voluntary or made under duress, and whether there existed a relationship between the parties. Because these concepts of duress and interrelated parties are also mentioned specifically in the OAR as examples of "non-typical market transactions," this court finds it appropriate to view an "arm's-length" sale as one that on the whole resembles a typical market transaction. To offer the subject property as evidence of the property's real market value, Plaintiff must therefore establish that the sale of the subject property was recent and arm's-length. Plaintiff's purchase of the subject property, which closed on January 18, 2019, occurred very close to the January 1, 2019 assessment date, so the sale meets the requirement that it be recent. The question becomes whether the sale of this property was arm's-length.

This court has previously been reluctant to find that auction sales are arm's-length because, unlike typical market transactions, they generally occur when a seller is experiencing some form of duress, and usually lack the negotiations between buyers and sellers. *See, e.g.,*

*Monserud v. Clatsop Cty. Assessor*, WL 2222187 (June 6, 2011); ("economic hardship sufficient to force the owner to unload the property at a public auction[]" constituted duress); *See, eg., Schnabel v. Clatsop County Assessor*, TC-MD 100618D, WL 646678 (Or Tax M Div, Feb 22, 2011) (holding that purchase at auction does not meet the statutory definition of an arm's-length transaction because "an auction eliminates the negotiation between the buyer and seller and requires buyers to negotiate with each other, generally leaving the seller out of the negotiation process.") Even in cases where an auction was followed by the kind of negotiations seen in typical market transactions, the court did not find the auction sale to be arm's-length. For example, in *Stanwood v. Multnomah County Assessor*, TC-MD 120222N, WL 6013253 at *1 (Or Tax M Div, Nov 30, 2012), the plaintiff was the winning bidder for a property at auction. The seller would not accept the bid and asked for a higher offer, which the plaintiff agreed to. *Id*. Although the property was a foreclosure sale at auction, the plaintiff testified the sale was an arm's-length transaction because the seller engaged in negotiation after rejecting the bid. *Id*. at 2. The defendant disagreed and argued the property was a distressed sale as indicated by the "pending foreclosure" and a "price drop" before auction. *Id*. at 4. Because the court found that the seller appeared distressed, the court determined the taxpayer did not overcome his burden of proof that the sale represented an arm's-length transaction. *Id*.

Here, Plaintiff's testimony persuasively showed that from his perspective the length and breadth of the marketing process and back-and-forth negotiations that took place after the auction demonstrates this was an arm's-length transaction. However, the recent history of the subject property contains unusual and unexplained facts that suggest the seller may have been under duress, which casts doubt on the assertion that this was a typical market transaction. There was no evidence presented to explain why the previous owner purchased the property for a price

50 percent higher than it sold for only one year earlier, why the new owner then re-listed the property at the higher price for an extended period of time, and why they failed to record their deed. The intervening failed sales transaction and the failed auction offer little information as to the motivation of the most recent seller. In the negotiating process the seller stated: "[t]his was well below [the seller's] target price, but I believe they were at the point where they were willing to make concessions to complete a transaction." (Ex 9 at 1.) Standing alone, this statement is not conclusive, but coupled with the fact the subject property experienced a steady and significant price drop, was unsuccessfully auctioned, and that the seller reached out to an unsuccessful bidder following the failed auction sale, the court is persuaded that there may have been an element of economic hardship constituting duress on the part of the seller. The court acknowledges that there was some negotiation involved after the failed auction, however, like in *Stanwood*, the existence of some negotiation is not sufficient to overcome the other evidence of potential distress that indicates this was a non-typical market transaction, and therefore not likely to be arm's-length.

Sometimes adequate marketing can negate a finding of distress. "If a property has been marketed for a sufficiently long period of time and properly exposed to the market, the implication of distress on the part of the seller may be removed * * *." *Kumbalek v. Multnomah County Assessor*, TC-MD 130125D, WL 4764067 at *2 (Sept 5, 2013), citing *Ward v. Dept. of Rev.*, 293 Or 506, 508, 650 P2d 923 (1982). Here, the subject property was exposed to the market, but the question is the adequacy of the exposure. The property was originally listed in early September 2017 for $1,250,000, above market value relative to similar, nearby properties. Potential buyers in the market may have rejected even considering the subject property early on due to the highly inflated initial list-price, the same way Plaintiff rejected the property at first.

Other potential buyers may have been reluctant to become involved with a property that was originally listed at an inflated price, only to experience such an unexplained drop in price of over $400,000 during its time on the market, and that experienced at least one failed purchase attempt, allegedly due to lack of seller cooperation. Plaintiff provided no additional evidence to demonstrate that the marketing of the property was adequate compared to typical market transactions, so the implication of distress is not overcome.

The implication of distress on the part of the seller, the inflated initial list-price, subsequent large fluctuations in list-price, and ultimate resort to auction indicate to the court that this was not an arm's-length, typical market transaction. Because the court finds this to be a non-typical market transaction, OAR 150-308-0240 requires that adjustments to purchase price be made for it to be considered evidence of real market value. Plaintiff has provided no evidence of adjustments that could be made to the subject property's purchase price for the court to use the subject property as evidence of real market value. The court will not consider the purchase price of the subject property to be "persuasive of market value," and will instead examine evidence of comparable sales provided by both parties to determine real market value. *Kem* at 114.

C.    *Evaluation of Comparable Market Sales as Evidence of Real Market Value*

1.    *Plaintiff's Evidence*

Plaintiff's primary evidence is an appraisal prepared in connection with Plaintiff's procurement of financing for the subject property. That appraisal selected five sales of properties comparable to the subject property and concluded that the real market value of the property was $723,000. (Ptf's Ex 8 at 2.) However, the person who prepared the appraisal did not appear at trial to explain the selection of properties or adjustments made. The court will not accept the appraiser's conclusions but may consider the comparable properties offered in the

appraisal as evidence of market value.

Plaintiff provided little evidence supporting the adjustments made to Comparable 1's sale price. For Comparable 2, the appraisal report standing alone did not counter Klugness' testimony about the conditions related to the long, steep staircase to get to the property's front door that may have decreased its value in comparison to the subject property. As to Comparable 3, Klugness testified that the property's age made price adjustments inappropriate, but Plaintiff provided numerous photographs showing that the property had obviously been updated, eliminating age as a negative factor in comparing the two properties. (Ex 11 at 35-37.) The sales price and Plaintiff's appraisal adjustments for Comparable 3 appear reasonable at $737,180. For Comparable 4, the appraisal did not explain why there was only an upward $20,000 adjustment for the lack of a city view. Comparable 5 was not a closed sale and cannot be used by the court.

Plaintiff secondarily relies on the comparative market analysis prepared by real estate broker Benjamin Acosta. That analysis used three of the same properties as the bank appraisal and offered minimal additional information. Again, Benjamin Acosta did not testify at trial to explain the adjustments and thus his conclusions will be given little evidentiary weight. Ultimately, the court is not persuaded by the conclusion of the appraisal or the comparative market analysis but finds that Plaintiff's Comparable 3, at an adjusted price of $737,180, should be considered.

/ / /

/ / /

/ / /

/ / /

2.      *Defendant's Evidence*

Defendant selected five comparable sales for its market analysis of the subject property. Comparables 1, 2, and 3 are all superior to the subject property. Comparable 1 was further from the freeway than the subject property and had the additional amenities of a garden area, with a bedroom and full bathroom on the main living level. Defendant only adjusted for the bathroom. Comparable 2 was a complete remodel down to the studs and a $250,000 adjustment appears completely inadequate for a property of almost 4,000 square feet. Comparable 3 was superior in most every aspect to the subject property. The *Appraisal of Real Estate* 15th Edition states that reliable results in the sales comparison approach "can usually be obtained by bracketing the subject property between comparable properties that are superior and inferior" to the subject property. Appraisal Institute, *Appraisal of Real Estate* at 376 (15th ed 2020). The problem with selecting properties "either all superior or all inferior, [is that] only an upper or lower limit of values is set and no range (or bracket) of possible values for the subject property can be defined." *Id*. Defendant's Comparables 1 through 3 are all superior to the subject property without a counterbalance, demonstrating only what the subject property's upper limit in value may be. As a result, Defendant's Comparables 1 through 3 provide the court with little information about where the subject property may fall within a range of values, and therefore do not provide persuasive evidence of what the overall value may be.[3]

Of Defendant's comparables, the court is most persuaded by Comparables 4 and 5, which constitute a paired sales analysis of a residence located 150 feet from the subject property. This property is on the same street, is of a similar age, and has the same view as the subject property.

---

[3] *See Oldenburg v. Wasco Cty. Assessor*, TC-MD 150145N, WL 4724813 (Or Tax M Div, Aug 10, 2015) (finding that "[b]racketing the subject property with comparable sales of properties with both higher and lower adjusted values would provide more persuasive evidence of the subject property's real market value.")

This property is slightly superior to the subject property because it has a bedroom and a full bathroom above grade, where the subject property does not. Although Comparable 5's sale occurred after the subject property's assessment date, including it in the analysis is not necessarily outside the Uniform Standards of Professional Appraisal Practice (USPAP). "A retrospective appraisal is complicated by the fact the appraiser already knows what occurred in the market after the effective date of the appraisal. Data subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date." The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* AO-34 (2018-19 Ed). It is permissible to use a sale subsequent to the effective date for appraisals based on the USPAP guidance, and Plaintiff made no objection to Defendant's Comparables 4 and 5. A flat market, combined with the proximity and similarities shared between the two properties, persuades the court that these comparables should be incorporated into the analysis of the subject property's RMV. Leendertse adjusted the sales prices for time of sale, above grade room count, gross living area and fireplaces, and found an adjusted sales price of $953,000 and $955,000 respectively.

      3.     *Real Market Value Conclusions*

The evidence offered by Plaintiff does not persuade this court that the real market value of the subject property is $675,000. Likewise, the evidence offered by Defendant does not persuaded this court that the real market value of the subject property is $955,000. The court deems Plaintiff's Comparable 3, with an adjusted sales price of $737,180, and the average adjusted sales prices for Defendant's Comparables 4 and 5 of $954,000, as the best comparables for determining the value of the subject property under the sales comparison approach. Because the court found Comparables 4 and 5 to be slightly superior to the subject property, it should be

given a little less weight. Weighing Plaintiff's Comparable 3 at 60 percent and Defendant's Comparables 4 and 5 at 40 percent, the court exercises its authority under ORS 305.412 to determine the value of the property "without regard to the values pleaded by the parties," and finds the real market value of the subject property as of the assessment date was $823,908.

## III. CONCLUSION

Upon careful consideration, the court finds that although Plaintiff's purchase of the subject property was near the date of assessment, the sale was not an arm's-length transaction and not persuasive of the real market value. Instead, the court considers other comparable sales presented by the parties and concludes that the real market value of the subject property as of the assessment date was $823,908. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of the subject property, for the 2019-20 tax year, was $823,908.

Dated this _____ day of October 2021.

 

 

_____
RICHARD DAVIS
MAGISTRATE

***If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.***

***Some appeal deadlines were extended in response to the Covid-19 emergency. Additional information is available at <u>https://www.courts.oregon.gov/courts/tax</u>***

***This document was signed by Magistrate Richard Davis and entered on October 26, 2021.***